## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas P. Seaton, Van L. Carlson,            Civil No. 14-1016 (DWF/JSM)
Linda C. Runbeck, and Scott M. Dutcher,

          Plaintiffs,

v.                                                        **MEMORANDUM**
                                                         **OPINION AND ORDER**

Deanna Wiener, George Beck, Jon Stafsholt,
Ed Oliver, Neil Peterson, and Christian Sande,
in their official capacities as Chair and
members of the Minnesota Campaign Finance
and Public Disclosure Board, and Tony Palumbo,
and Chad Larson, in their official capacities as
county attorneys for Anoka and Douglas Counties,

          Defendants.

_____

Katelynn K. McBride, Esq., Lee U. McGrath, Esq., and Anthony B. Sanders, Esq., Institute for Justice, counsel for Plaintiffs.

Alan I. Gilbert and Jacob D. Campion, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

_____

## INTRODUCTION

       This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 6). For the reasons set forth below, the Court grants Plaintiffs' motion.

## BACKGROUND

Plaintiffs Linda C. Runbeck, and Scott M. Dutcher (together, the "Candidate Plaintiffs") are current and former candidates for Minnesota state office. (*See, e.g.,* Doc. No. 1, Compl. ¶¶ 6-7.) Plaintiff Runbeck is the state representative for Minnesota District 38A and is running for reelection in 2014. (*Id.* ¶ 6.) Plaintiff Dutcher ran and lost the state legislative race for Minnesota District 12A in 2012. (*Id.* ¶ 7.) Plaintiffs Douglas P. Seaton and Van L. Carlson (together, the "Donor Plaintiffs") are campaign donors who "would like to make contributions of more than half the individual contribution limit and to be able to do so without disadvantaging the candidates to whom [they] contribute[]." (*See, e.g., id.* ¶¶ 4-5.)

At the heart of Plaintiffs' lawsuit is the "special sources" limit set by Minnesota statute. (*Id.* ¶ 14.) In particular, Plaintiffs challenge the constitutionality of Minn. Stat. § 10A.27, subd. 11—insofar as it restricts donations from "large contributors"—in light of the recent United States Supreme Court decision, *McCutcheon v. Federal Election Commission*, 134 S. Ct. 1434 (2014). Minn. Stat. § 10A.27, subd. 11, states:

> **Contributions from certain types of contributors.** A candidate must not permit the candidate's principal campaign committee to accept a contribution from a political committee, political fund, lobbyist, large contributor, or association not registered with the board if the contribution will cause the aggregate contributions from those types of contributors during an election cycle segment to exceed an amount equal to 20 percent of the election cycle segment expenditure limits for the office sought by the candidate, provided that the 20 percent limit must be rounded to the nearest $100. For purposes of this subdivision, "large contributor" means an individual, other than the candidate, who contributes an amount that is more than one-half the amount an individual may contribute during the election cycle segment.

Minn. Stat. § 10A.27, subd. 11. Plaintiffs' Complaint asserts that the special sources limit as applied to "large contributions" violates Plaintiffs' First Amendment rights of free speech and association. (*See* Compl. ¶¶ 109-14.)

## DISCUSSION

### I. Standing

Defendants maintain that Plaintiffs lack standing to bring suit against Defendants here. Defendants argue that because the Donor Plaintiffs can right now make, and the Candidate Plaintiffs can right now receive, the campaign contributions at issue under the statute, Plaintiffs have no basis upon which to assert that they have been prevented from exercising their First Amendment rights. Plaintiffs counter that the chilling effect of the statute on First Amendment rights is sufficient to create an injury.

To have standing under Article III of the Constitution, a plaintiff must allege (1) a concrete injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by the relief sought. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992) ("[T]here must be a causal connection between the injury and the conduct complained of," and it must be likely "that the injury will be 'redressed by a favorable decision.'").

The Donor Plaintiffs allege that the special sources limit has prevented them from making donations in prior elections and currently chills their ability to make intended contributions to 2014 election candidates. (*See* Compl. ¶¶ 44-62; Doc. No. 9, Ex. 5 ("Seaton Decl.") ¶¶ 7-15; Doc. No. 9, Ex. 1 ("Carlson Decl.") ¶¶ 6-9.) The Candidate Plaintiffs, meanwhile, allege that the limit has forced them to return contributions to

3

donors and restrains their ability to seek contributions in the full amount of the $1,000 individual limit. (*See* Compl. ¶¶ 40, 64-65, 69-71, 74-75; Doc. No. 9, Ex. 3 ("Runbeck Decl.") ¶¶ 14-15, 17, 21-23; Doc. No. 9, Ex. 2 ("Dutcher Decl.") ¶¶ 12-13, 15, 17.) In particular, Plaintiff Runbeck alleges that the special sources limit restricts her from actively seeking more than $500 contributions in her 2014 fundraising campaign. (*See* Compl. ¶ 64; Runbeck Decl. ¶¶ 21-23.)

While the injuries alleged by the Candidate Plaintiffs differ from those alleged by the Donor Plaintiffs, each of the four Plaintiffs has identified various ways in which the statute at issue has previously restrained, or currently "chills," his or her First Amendment freedoms. As a threshold matter, the Court concludes that Plaintiffs have alleged a concrete injury, that is fairly traceable to the challenged statute, and that is likely to be redressed by a ruling on the constitutionality of the special sources limit as it pertains to large contributors. *See Lujan*, 504 U.S. at 560-61. As such, Plaintiffs have standing to assert their claim.

## II. *McCutcheon* Holding

"[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association," and "[w]hen an individual contributes money to a candidate, he exercises both of those rights." *McCutcheon*, 134 S. Ct. at 1448. According to the Supreme Court, in order to be valid, any regulation of campaign contributions must target "'*quid pro quo*' corruption or its appearance," that is, the "direct exchange of an official act for money," or "dollars for political favors." *Id.* at 1441; *see also id.* at 1450 ("In addition to 'actual *quid pro quo*

4

arrangements,' Congress may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates."). The Government may not impose campaign finance restrictions that pursue other objectives. *See id.* at 1441 ("Campaign finance restrictions that pursue other objectives . . . impermissibly inject the Government 'into the debate over who should govern.'"); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359 (2010) ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption.").

In *McCutcheon*, the Supreme Court held that aggregate limits—restrictions on the amount of money a donor may contribute in total to all candidates or committees—"do little, if anything," to further the permissible purpose of combatting *quid pro quo* corruption, "while seriously restricting participation in the democratic process." *McCutcheon*, 134 S. Ct. at 1442. Specifically, the Supreme Court stated:

> Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption. Nor does the possibility that an individual who spends large sums may garner "influence over or access to" elected officials or political parties.

*Id.* at 1450-51; *see also id.* at 1441 ("[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access are not corruption.'") (quoting *Citizens United*, 558 U.S. at 360). The Supreme Court therefore concluded that the

aggregate limits of 2 U.S.C. § 441a(a)(3) were invalid under the First Amendment. *See McCutcheon*, 134 S. Ct. at 1442.

### III. *Dataphase* Factors

Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

The first *Dataphase* factor normally requires that the movant establish a substantial probability of success on the merits of its claim. *Dataphase*, 640 F.2d at 114. Because Plaintiffs seek to invalidate a state statute, however, they must meet a more rigorous standard by showing that they are "likely to prevail" on the merits. *Planned Parenthood of Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 730-33 (8th Cir. 2008). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman,* 662 F.3d 485, 488 (8th Cir. 2011)

(per curiam); *see Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012).

The Court considers each of the *Dataphase* factors below.

### A. Likelihood of Success on the Merits

"Because of the inherent public interest in free speech and the threat of irreparable injury if speech is suppressed, courts rarely focus on the three latter *Dataphase* factors; instead they look primarily to whether the party seeking the preliminary injunction is likely to succeed on the merits." *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1031 (D. Minn. 2010) (quoting *Wickersham v. City of Columbia, Missouri*, 371 F. Supp. 2d 1061, 1075 (W.D. Mo. 2005)). In a First Amendment case, "the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). The Court finds that Plaintiffs have met their burden of demonstrating that they are likely to succeed on the merits of their claim.

Plaintiffs challenge Minn. Stat. § 10A.27, subd. 11, insofar as it applies to individuals who make contributions of more than one-half the individual contribution limit. *See* Minn. Stat. § 10A.27, subd. 1 (setting forth contribution limits for various candidates, including a limit of $1,000 "to a candidate for state representative"). Plaintiffs contend that the special sources limit does not further the interest of preventing *quid pro quo* corruption or the appearance thereof. Specifically, Plaintiffs claim that the statute "arbitrarily cuts an ordinary citizen's contribution in half once the candidate he

7

supports has accepted more than a certain amount of money from certain types of donors" and thus violates the First Amendment. (Doc. No. 8 at 1-2.)

Defendants maintain that the Candidate Plaintiffs may simply return contributions to donors "at any time" (Doc. No. 26 (citing Minn. Stat. § 10A.01, subd. 26(2))),[1] therefore donors are not actually prohibited from writing checks to state legislative candidates in amounts up to $1,000. The return of "excess" donor contributions, however, has a chilling effect on speech and burdens the exercise of First Amendment freedoms as defined by the Supreme Court. *See, e.g., Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2820-21 (2011).

The legislative history and evidence relied upon by Defendants lend substantial support for the proposition that the special sources limit was enacted for the purpose of combatting concerns separate from *quid pro quo* corruption—namely efforts to lessen the "disproportionate influence" of large donors, to "level the playing field," and to "reduce the role of big money in politics." (Doc. No. 21, Campion Aff. ¶ 7, Ex. 6 ¶ 7; *see, e.g.*, Doc. No. 9, Ex. 4 ("Sanders Decl.") ¶ 4, Ex. A (identifying goal of achieving "a level playing field").) As the Supreme Court made clear in *McCutcheon*, however, the Government "may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others." *McCutcheon*, 134 S. Ct. at 1441. The *McCutcheon* Court further held that "the possibility that an individual who spends large sums may garner 'influence

---

[1] Defendants maintain that contributions returned within 90 days are not reported as contributions, and those returned after 90 days are reported as "noncampaign disbursement[s]." (Doc. No. 26 (citing Minn. Stat. §§ 10A.01, 10A.15 & 10A.20).)

CASE 0:14-cv-01016-DWF-JSM   Document 28   Filed 05/19/14   Page 9 of 14

over or access to' elected officials or political parties" does not "give rise to" *quid pro quo* corruption. *See id.* at 1450-51. Therefore, any statute aimed at combatting such influence or access—and not specifically targeted toward efforts "to control the exercise of a [politician's] official duties"—is constitutionally prohibited. *See id.*

While the Court may not agree with the Supreme Court's interpretation of the First Amendment in this regard, and echoes the concerns of other courts that have addressed similar issues in light of *McCutcheon*, the Court is nonetheless bound by the decisions of the Supreme Court. *See, e.g., New York Progress & Protection PAC v. Walsh*, Civ. No. 13-6769, 2014 WL 1641781, at *2 (S.D. N.Y. Apr. 24, 2014) (noting that, "[i]n effect, it is only direct bribery—not influence—that the [Supreme] Court views as crossing the line into *quid pro quo* corruption," but agreeing with Justice Breyer's dissent that "[t]his critically important definition of 'corruption' is inconsistent with the Court's prior case law"); *see also McCutcheon*, 134 S. Ct. at 1470 (Breyer, J., dissenting) (noting that the Supreme Court has "rejected efforts to define 'corruption' in ways similar to those the plurality today accepts" and finding that "[i]nsofar as today's decision sets forth a significantly narrower definition of 'corruption,' and hence of the public's interest in political integrity, it is flatly inconsistent with *McConnell*"). As such, on the record before it, it appears that Plaintiffs are likely to prevail on the merits.

Importantly, at issue here is the relative impact of large contributions based on timing alone. For example, in Minnesota, the first twelve donors to a candidate for state house or senate may contribute the maximum of $1,000, but the thirteenth donor may contribute only $500 in order for the candidate not to exceed the special sources limit of

9

$12,500. That is to say, once a candidate for state legislative office raises $12,500 in large contributions (donations in amounts over $500 and up to $1,000), the $1,000 limit is then, in effect, reduced to $500. In that manner, "late" donations are arbitrarily treated differently than "early" donations. One would assume that the thirteenth contribution to a legislative candidate in the amount of $1,000 causes no more concern of corruption than the first twelve $1,000 donations. *See McCutcheon*, 134 S. Ct. at 1452 ("If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime.").

While it is true that the statute at issue in *McCutcheon* required a complete ban on all contributions in *any* amount once an individual donor reached the aggregate limit, *see id.*, the Court also acknowledged that:

> It is no answer to say that the individual can simply contribute less money to more people. To require one person to contribute at lower levels than others because he wants to support more candidates or causes is to impose a special burden on broader participation in the democratic process. And as we have recently admonished, the Government may not penalize an individual for "robustly exercising" his First Amendment rights.

*Id.* at 1449 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008)). Therefore, reason would dictate that limiting one donor to a contribution of only $500 while others who contributed before him were permitted to donate $1,000 would similarly constitute a penalty for the "robust exercise" of his First Amendment rights. *See McCutcheon*, 134 S. Ct. at 1449.

10

Moreover, contrary to Defendants' assertions, the special sources limit appears to be directed at leveling the political playing field and reducing the amount of money in politics. The legislative history of the statute casts significant doubt on Defendants' contention that the statute was enacted to prevent *quid pro quo* corruption as defined by the Supreme Court.

After reviewing the record and the relevant authority, the Court concludes that, regardless of whether the "closely drawn" or strict scrutiny standard applies, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim. *See id.* at 1445-46. Accordingly, this factor strongly supports granting Plaintiffs' request for injunctive relief.

B. **Irreparable Harm, Balance of Harms and Public Interest**

Plaintiffs must also establish that irreparable harm will result if injunctive relief is not granted. *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). For this reason, the irreparable harm factor generally weighs in the movant's favor in First Amendment cases, although it is often intertwined with a court's evaluation of the likelihood of success on the merits. *See Phelps-Roper*, 545 F.3d at 690 (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation").

11

Likewise, the determination of where the public interest lies is also dependent on the likelihood of success on the merits of the First Amendment challenge "because it is always in the public interest to protect constitutional rights." *Id.* In addition, the balance of equities typically favors the constitutionally-protected freedom of expression. *Id.*

While Plaintiffs' likely success on the merits may be determinative in this case, the Court concludes that the irreparable harm, balance of harms, and public interest *Dataphase* factors also each independently weigh in favor of granting the motion for injunctive relief.

## CONCLUSION

As stated by the Honorable Paul A. Crotty, "today's reality is that the voices of 'we the people' are too often drowned out by the few who have great resources." *New York Progress & Protection PAC*, 2014 WL 1641781, at *1.

> [T]he anticorruption interest that drives Congress to regulate campaign contributions is a far broader, more important interest than the [*McCutcheon*] plurality acknowledges. It is an interest in maintaining the integrity of our public governmental institutions. And it is an interest rooted in the Constitution and in the First Amendment itself.

*McCutcheon*, 134 S. Ct. at 1466-67 (Breyer, J., dissenting). "Just as troubling to a functioning democracy as classic *quid pro quo* corruption is the danger that officeholders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 153 (2003), *overruled by Citizens United*, 558 U.S. at 365-66. Instead of focusing on such legitimate concerns, the *McCutcheon* decision "understates the importance of protecting the political integrity

12

of our governmental institutions" and "creates a loophole that will allow a single individual to contribute millions of dollars to a political party or to a candidate's campaign." *McCutcheon*, 134 S. Ct. at 1465 (Breyer, J., dissenting).

Although the undersigned may not agree with the Supreme Court's recent line of cases on the subject of campaign finance, and their effect on the integrity of our public governmental institutions, the Court acknowledges that it is nevertheless bound by the decisions of the Supreme Court.  As such, the Court finds that Plaintiffs have demonstrated that they are likely to prevail on their constitutional claim and that the other *Dataphase* factors support the issuance of a temporary restraining order and preliminary injunction.  Because Plaintiffs have met their burden to show that injunctive relief is warranted, the Court grants Plaintiffs' motion.  In light of the Supreme Court's recent decision in *McCutcheon*, the Court enjoins Defendants from enforcing the provisions of Minn. Stat. § 10A.27, subd. 11, with respect to individual "large contributors."

## ORDER

Based upon the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. [6]) is **GRANTED**.

2. Defendants are **ENJOINED** from enforcing Minn. Stat. § 10A.27, subd. 11, as applied to individuals who contribute to candidates in amounts equal to more than one-half of the individual contribution limit.

Dated:  May 19, 2014                         s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge